IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs February 18, 2021

**STATE OF TENNESSEE v. STEVEN MICHAEL SIMPSON**

**Appeal from the Criminal Court for Knox County**
**No. 114137    Scott Green, Judge**

_____

**No. E2020-00345-CCA-R3-CD**

_____

The defendant, Steven Michael Simpson, appeals his Knox County Criminal Court jury conviction of first degree felony murder, arguing that the evidence was insufficient to support his conviction. Discerning no error, we affirm.

**Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

Gerald L. Gulley, Jr. (on appeal) and Mitchell T. Harper (at trial), Knoxville, Tennessee, for the appellant, Steven Michael Simpson.

Herbert H. Slatery III, Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; Charme P. Allen, District Attorney General; and Hector Sanchez and Keven Allen, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

The Knox County Grand Jury charged the defendant with first degree felony murder during an attempt to perpetrate a theft, an alternative count of first degree felony murder during an attempt to perpetrate a robbery, and one count of especially aggravated robbery related to the death of his roommate, William Innes.

At the October 2019 trial, Stephanie Pinkston testified as a recordkeeper with Knox County 9-1-1. A computer-aided dispatch ("CAD") report and an audio recording of a 9-1-1 call placed on April 13, 2018, were exhibited to her testimony, and the 9-1-1 call was played for the jury.

John Mays, an officer with the Knoxville Police Department ("KPD"),

testified that he responded to Sevier Avenue on April 13, 2018. Other officers arrived at the same time. The officers entered the house and found a deceased victim on the living room floor "right there inside the front door." Officer Mays said that "medical was just leaving" and had already determined that the victim was deceased. He stated that it was apparent to him that "it was a violent death" because the victim had blood on him and "there was blood on the floor all around him." After a protective sweep of the house, he secured the scene for investigators.

Jacklyn Walkup, a crime scene investigator with KPD, testified that she responded to the scene where she began with "an overall view" to understand what had been done at the scene by other investigators before she arrived. She then did a walk-through of the scene, documenting anything that appeared "out of the ordinary" while a crime scene technician video recorded the scene. Investigator Walkup photographed the scene and used "the chemical Bluestar" to "look for traces of latent blood . . . that has been cleaned up." She stated that she also photographed and used Bluestar on the suspect's vehicle a couple of days later. The jury viewed the video taken during the walk-through and numerous photographs of the crime scene.

Investigator Walkup stated that the front door of the home had signs of forced entry but noted that the house was built in 1925, and she could not say whether the forced entry related to this incident. In the bathroom, she found that the shower and the bath mat were wet, indicating that someone had showered recently. She also found wet clothes in the washing machine that included "a blue shirt, size 34 navy blue pants, and [a] black glove" that matched black gloves found behind the sofa in the living room, on the kitchen counter, and on the front porch. She collected a crowbar from on top of the dryer. Investigator Walkup said that blood stains on the sofa indicated to her that that "seem[ed] to be where the altercation may have occurred." In addition to numerous physical items collected into evidence, she also took swabs of blood stains for DNA testing. On the backdoor, she found "faded fingerprints in red blood stains." She later took DNA swabs from the defendant.

Investigator Walkup photographed the defendant's injuries, including one above his left eye, one along his hairline above his right eye, one behind an ear, and one on top of his head. The defendant also had "some bruising and scratching" along "the top side of his right arm." In the defendant's vehicle, Investigator Walkup found "gloves under the driver's side seat" and a "baggie with [a] scale." She "found a few specks in the passenger side seat" that reacted slightly with the Bluestar reagent, but she stated that it was "not enough to conclude that it is, in fact, red blood stains."

During cross-examination, Investigator Walkup acknowledged that none of the belongings in the bedrooms of the home appeared to have been disturbed, including a

purse found in one of the bedrooms. Investigator Walkup photographed the defendant at 3:56 a.m. on April 14, 2018.

Stephanie Housewright, a former crime scene technician with the Knoxville Police Department, testified that on April 13, 2018, she collected a garbage bag from a dumpster on Moody Avenue in South Knoxville. She first photographed the dumpster and garbage bag as she found them and then photographed the contents of the bag. Inside the bag, she found "blue nitrile gloves," "multiple towels, shoes, clothing, a bar of some sort, and a knife." She stated that the items in the bag had "red blood-like stain[s]" and that the towels had bleach stains. Ms. Housewright said that she found "a shiny fluid" on the metal bar, but, because the bar was black, she could not determine the color of the substance.

During cross-examination, Ms. Housewright testified that Investigator Clayton Madison dispatched her to the Moody Avenue location. Investigator Madison was present when she collected and photographed the garbage bag from the dumpster. She acknowledged that the dumpster contained multiple garbage bags and explained that Investigator Madison directed her to the specific bag to be collected. She stated that she swabbed the blood-like substance found on the knife but said that she did not swab the metal bar because the entire bar was to be submitted to the Tennessee Bureau of Investigation ("TBI") lab for testing.

Terry Miller testified that he first met the defendant on April 13, 2018, at Al's Market on Moody Avenue in South Knoxville, at which time, Mr. Miller was using crack cocaine, heroin, and "a number of drugs." The defendant was with "Will," whom Mr. Miller assumed was the defendant's roommate. Mr. Miller said that the defendant invited him over to his house, and Mr. Miller accepted the invitation. At the house, which was "right there next to James White Parkway," Mr. Miller "sat there," and the victim "offered me a beer." Mr. Miller met the defendant's other roommate, a woman, when he arrived at the house.

After approximately two hours, the defendant drove Mr. Miller to Mr. Miller's brother's house near Seymour because the defendant asked him to try to "get some money from my brother . . . . And I told him I didn't know, I would try and see if I could." Mr. Miller assumed that the defendant wanted money for drugs. Mr. Miller stated that the defendant was wearing "a white shirt with -- I think it was a brown collar at the top of it" at the time. He told the defendant "just to come back by whenever he got done" with "a side job" to pick him up.

Mr. Miller was at his brother's house for approximately three hours when the defendant returned to pick him up. Mr. Miller noticed that the defendant was wearing different clothing than he had been wearing earlier in the day and that he "had like a little

small cut" "[b]elow his ear, like right behind his ear." The defendant told Mr. Miller that "he got hurt on the job." The defendant also had money with him that he told Mr. Miller "he had gotten . . . from a side job," and the defendant asked him to use the money to purchase "any crack or meth."

The men then went "to Angela's house"[1] on Moody Avenue, where Mr. Miller "used the phone there to call to get drugs, to get crack cocaine." Mr. Miller said that he "call[ed] Tina up on the hill to go get crack," and he and the defendant "left there, went to the top of the hill" where he "obtained $20 worth of crack" with the defendant's money, and "[c]ame back to Angie's house," where they "smoked crack with Angie and stuff."

At some point, Mr. Miller's girlfriend, Elizabeth Evans,[2] asked for a ride from a Burger King on Middlebrook Pike. Mr. Miller stated that before picking up Ms. Evans, the defendant "wanted to clean up the car" in order to "fit all your stuff in there" because Mr. Miller's roommate had recently kicked him out. The defendant stopped "at this little small apartment complex off "Moody or Woodlawn" that had a dumpster sitting outside, and they "cleaned the car out." Mr. Miller said that he saw "a black trash bag" in the trunk of the car and asked the defendant, "'Hey, is this trash?'" The defendant told him that it was trash, and Mr. Miller put the bag in the dumpster. Mr. Miller stated that he did not "think nothing about that" at the time and that "it never dawned on me what was in that bag at all."

Mr. Miller clarified that Ms. Newcomb was with him and the defendant and that, after cleaning out the defendant's car, they "stop[ped] at a gas station to pick up meth for [the defendant] . . . from a buddy of mine that I know that sells meth." Mr. Miller acknowledged that he arranged the drug purchase but stated that the defendant paid for the methamphetamine. They then picked up Ms. Evans from Middlebrook Pike and returned "to South Knoxville to Jim Bob's"[3] house where "[t]here was a bunch of people there. We sat there and we smoked crack. He did his meth and I did some heroin." Mr. Miller stated that he saw the defendant "shoot . . . up" methamphetamine.

At some point that evening, Mr. Miller learned that police officers were at the defendant's house, and Mr. Miller tried to get the defendant to return home, but the defendant "said that he didn't want to go home yet." Mr. Miller said that the defendant

---

[1]    The person referred to by witnesses as "Angela" or "Angie" appears from the record to be Angela Newcomb.
[2]    Mr. Miller identified his girlfriend as Elizabeth Evans or Elizabeth Jones, "whichever one she decides to go by" "[a]t the time." Because she identified herself as "Elizabeth Marie Evans" in her testimony, we will refer to her as Ms. Evans.
[3]    "Jim Bob's" last name is not provided in the record.

-4-

wanted to leave Jim Bob's house and "kind of persisted that me and [Ms. Evans] go with him." The trio drove to a house on Chapman Highway near Seymour "where the defendant's work van was parked, and we sat there for a minute or so." Mr. Miller stated that they stayed there for 30 to 40 minutes, during which time the defendant smoked crack cocaine. A detective reached the defendant by cellular telephone, and the defendant told the detective that he was in Sevier County, which Mr. Miller stated was not true. Mr. Miller said that the defendant was instructed to go to a police station in Sevier County. He also said, "I didn't really know what was going on at that point. I did know that [the defendant] was lying at that point in time." He recalled that the defendant also told the detective that he was in a white car and had been with Mr. Miller "all day, working in Sevierville," but Mr. Miller noted that the car that they were in was the defendant's "red Ford Focus."

Mr. Miller stated that they drove "around for a little bit" and that the defendant told Ms. Evans to "cut her phone off," explaining that Ms. Evans was the only one of the three with a cellular telephone. Mr. Miller said that the defendant "wanted to see her cut her phone off" and "had her take the battery out," which made Mr. Miller "very suspicious." The defendant drove to a gas station at "John Sevier and Asheville Highway," where he asked Mr. Miller to drive because Mr. Miller "had a valid license" and because the defendant "said he was tired." Mr. Miller drove to Walker Springs Road in West Knoxville, where Ms. Evans had arranged for them to stay the night with a friend. When they stopped at a McDonald's and Pilot station, Mr. Miller noticed that the defendant was asleep and "snoring pretty heavy," at which point Mr. Miller told Ms. Evans to turn her telephone back on to enable the police to find them. Mr. Miller exited the car to go inside the convenience store, and as he "was walking across the parking lot, . . . SWAT jumped out of the vehicles on us with guns draw[n]" and took them into custody.

During cross-examination, Mr. Miller acknowledged that two weeks before trial, he reviewed the video-recorded statement that he had given to police officers, which recording refreshed his memory of the events of April 2018. He acknowledged that he was using a lot of drugs at the time of the offenses and that he did not "really remember it all that clear" because "it's been a long time ago." Mr. Miller stated that neither he nor the defendant had a cellular telephone and that they used Ms. Newcomb's telephone to set up the drug deal to purchase methamphetamine on their way to pick up Ms. Evans.

Mr. Miller stated that he "was actually kind of enjoying myself" at Jim Bob's and did not want to leave when the defendant did, but Mr. Miller agreed to leave with him because the defendant "was pretty persistent about it." Mr. Miller said that he believed that the police were looking for them by the time they arrived at the McDonald's "[b]ecause the way [the defendant] was lying" "to the police about . . . where we was at and stuff." "I figured something was majorly up then, you know." Mr. Miller acknowledged that, when

-5-

the police officers interrogated him about his involvement with the offenses, they threatened to charge him with the homicide of the victim or with facilitation of the homicide. He also acknowledged that, ultimately, he was not charged in connection with this case.

On redirect examination, Mr. Miller stated that he had a "[v]ery clear head" at the time of trial, noting that he was clean from drugs.

Elizabeth Evans testified that she had known the victim for "[p]robably twenty or thirty years" before his death, noting that they had lived in the same neighborhood "for about forty years." On April 13, 2018, Ms. Evans and her daughter were cleaning her niece's house when her daughter had to leave unexpectedly to care for a sick child. Ms. Evans got a ride from a friend as far as Middlebrook Pike and called Mr. Miller to "see where he's at and if anybody ha[d] a vehicle they could come pick me up." The defendant, Mr. Miller, and Ms. Newcomb came to pick her up in the defendant's red Ford car, and the group went to Jim Bob's, where they "smoked some crack and done some heroin." She saw the defendant using what she believed to be crack cocaine and methamphetamine.

Ms. Evans stated that they left Jim Bob's after approximately three hours, and "we went up the hill and we got a little more crack," for which the defendant paid. She said that "at first," they "were just driving around" before going "somewhere towards Seymour." The defendant drove "up there to some back road" and told Ms. Evans and Mr. Miller "that he had a van that he was going to sell us." Ms. Evans asked the defendant to "call his roommates . . . to find out what had happened down at the house," and the defendant used Ms. Evan's cellular telephone to call one of his roommates, who told him, "'I have somebody here that wants to talk to you.'" Ms. Evans said that "evidently it was an investigator or a police officer." Ms. Evans stated that the defendant lied to the officer on the phone, telling him that the defendant, Ms. Evans, and Mr. Miller "had been in Sevierville working and that he had not been in town," that the defendant was still in Sevierville, that he was in a white car, and that he was not driving.

After speaking with the officer, the defendant told Ms. Evans to turn her telephone off and remove the battery, which Ms. Evans did. Ms. Evans asked the defendant to stop at a place for her to use the restroom "because I was very nervous and confused about what was going on," noting that the defendant's lying to an officer scared her. When the defendant stopped at a store for Ms. Evans to use the restroom, she told Mr. Miller of her concerns and contacted a friend to ask to stay the night. Her friend told her that Ms. Evans could stay with her but that the men would have to stay in the car, and Ms. Evans agreed to the arrangement. Mr. Miller began driving at that point, and they stopped at a McDonald's when they noticed that the defendant had fallen asleep. Ms. Evans said that

when she saw that the defendant was sleeping, she turned her telephone back on and "put it on silent."

Ms. Evans stated that while they sat in the car to eat, she "looked up and I tapped [the defendant] on the shoulder and said, 'Hey, I believe they're here for us.'" At that point, the police removed them from the car and took them into custody. Ms. Evans said that she was questioned about the events of that day but was not charged in this case.

During cross-examination, Ms. Evans clarified that she asked to stay the night with her friend "[r]ight before we went there." She said that she turned her telephone on as soon as she realized that the defendant was asleep. Ms. Evans stated that she sought a place to spend the night because the defendant "said we weren't going home." According to Ms. Evans, Mr. Miller met the defendant when Mr. Miller was living with Ms. Evans at some point on East Moody Avenue.

During redirect examination, Ms. Evans recalled the defendant's complaining of his head hurting but said that she did not see any injury.

Jennifer Williams,[4] the victim's roommate, testified that she had lived at the Sevier Avenue house for approximately two months before the victim's death. She shared a room with her then-boyfriend David Williams, who was her husband at the time of trial. She said that she had never seen the victim be violent but acknowledged that, on one occasion, the victim and the defendant got into a verbal argument, which ended when the victim "just did his little hand flick and walk[ed] off."

Ms. Williams stated that on the morning of April 13, 2018, the defendant drove the victim "to cash his check," explaining that the defendant was the only one of the roommates with a vehicle. The men returned home while Ms. Williams was preparing to leave for a job interview. Ms. Williams said that she left the house between 11:00 a.m. and 11:30 a.m., noting that the victim was in a cheerful mood and that he gave her money for bus fare.

Ms. Williams explained the living arrangements: "So [the victim] had the main room, and me and Mr. Williams shared a room, and [the defendant] was sleeping on the couch." She said that the defendant had moved in only a couple of weeks prior to the victim's death and kept his belongings "in the kitchen, for the most part." Ms. Williams stated that she cooked and cleaned the house in exchange for her living there, noting that she cleaned "[q]uite frequently" because "I lived with three men."

---

[4]     Ms. Williams stated that her name was Jennifer Jones at the time of the offenses in this case.

While Ms. Williams waited for the bus to return home after her interview, Mr. Williams called her and told her that the situation was "very serious" and that he had found the victim "on the floor, and he thought he was dead." After she returned home, she and Mr. Williams went to the police station and talked with investigators. Later that day, she and Mr. Williams were at the house and "both received messages and phone calls," but they did not answer the calls because they did not recognize the telephone number. Ms. Williams said that the defendant followed up the unanswered calls with text messages saying, "'Hey, I tried to call. What's going on? I just drove by the house.'" Ms. Williams reported the messages to Investigator Madison. Investigator Madison returned to the house, and Ms. Williams called the unknown number, and "a woman answered and she passed the phone to [the defendant]." Investigator Madison spoke with the defendant over speakerphone at that time. Ms. Williams said that she heard the defendant tell Investigator Madison that "he wasn't in town," "he didn't have the gas to go to the police department," and that "this is a matter that he could handle over the phone."

During cross-examination, Ms. Williams testified that the items seen in the photographs sitting around the house in plastic bins, boxes, and trash bins belonged to the defendant. She acknowledged that, in the bathroom, "[t]here was some water standing from time to time that would get up under the rug." She said that she had never before seen the crowbar that investigators found on the washer and dryer.

Ms. Williams stated that on the morning of the victim's death, the defendant drove Mr. Williams to work at approximately 7:00 a.m. and took the victim to cash a check later that morning. Ms. Williams said that she was awake when the defendant and victim left the house. She did not remember anyone's returning to the house with them. She acknowledged that the victim was already drunk by that time, which, she stated, was not out of the ordinary. Ms. Williams said that she received the telephone and text messages from the defendant "rather late that night."

David Williams testified that on the morning of the victim's death, the defendant drove him to work, where Mr. Williams remained all day. The defendant gave Mr. Williams a telephone number to text when he was ready to be picked up at the end of his workday. When Mr. Williams texted that number, the defendant did not respond, and Mr. Williams' supervisor drove him home. Mr. Williams "opened the front door and found [the victim] laying in the floor covered in blood. He wasn't moving. I was screaming his name. He wasn't moving." Mr. Williams stated that he immediately called 9-1-1 and waited on the front porch for emergency responders to arrive. Mr. Williams spoke with investigators at the police station, and later that same day, Investigator Madison returned to the house and spoke with the defendant over the telephone.

Mr. Williams said that he first met the victim approximately five years prior

through Steps House, a halfway house and recovery facility. Mr. Williams acknowledged that he had previously struggled with alcoholism but had been sober for 18 months at the time of trial. He described the victim as "real easy-going, kind-hearted. He'd help people out" and said that he had never seen the victim become aggressive or violent. Mr. Williams said that he had known the defendant, whom he also met through Steps House, for a "few years."

On cross-examination, Mr. Williams testified that the defendant drove him to work on the morning of April 13 between 7:00 a.m. and 7:30 a.m. He stated that the defendant did not have a telephone at the time and that the telephone number the defendant provided him was the number of someone who would notify the defendant when Mr. Williams was ready to be picked up from work. He acknowledged that he did not communicate with the defendant after being dropped off at work.

Mr. Williams acknowledged that the victim "drank often," including in the mornings but stated that, although the victim "drank a lot," "[h]e was pretty functional." He acknowledged that the living situation with the victim was not conducive to maintaining sobriety. Mr. Williams said that the victim paid the rent for the house, and Mr. Williams helped out with the utilities. He denied that he owed the defendant money.

Joey Mace, a builder and Mr. Williams' former employer, testified that in April 2018, they were "bricking some condominiums" in the "Straw[berry] Plains Pike area." He said that a typical workday was from 7:30 a.m. to 4:00 p.m. but noted that the hours "depend[ed] on the season, the day." Mr. Mace stated that on April 13, 2018, Mr. Williams was with him all day from 7:30 a.m. until he drove Mr. Williams home at 3:45 p.m.

During cross-examination, Mr. Mace testified that he drove Mr. Williams to Sevier Avenue and dropped him off and drove away as Mr. Williams went inside the house. He stated that they usually worked Monday through Friday but noted that they "[p]robably were off early that day, being Friday, payroll and things like that going on."

Bill Bright testified that he owned the house at Sevier Avenue, which he had rented to the victim. He said that he had known the victim "probably seven years" and had "rented to him off and on, different locations." He stated that the victim was a good tenant and kept the property in order. He said that the rent was $600 per month, which he allowed the victim to pay in two installments of $300 each. The victim always paid in cash, and Mr. Bright maintained receipts of all of the payments. Mr. Bright went to the victim's house on April 13, 2018, at noon to collect the rent. On that occasion, the victim paid $260 and told Mr. Bright that one of his roommates "was to come by and pay him money" to help cover the remaining $40.

During cross-examination, Mr. Bright testified that he expected the victim to pay the remaining $40 owed on his rent on the next bimonthly payment. He stated that, as a landlord, he "tr[ied] to help people out. If they're short that month, they catch up the next month." Mr. Bright said that he did not have a set time to collect the rent from the victim; rather, the victim would call him and let him know that he had the rent payment and when he would be home for Mr. Bright to collect it. Mr. Bright stated that he did not know the defendant.

KPD Investigator Michael Washam testified that he and Investigator Madison interviewed the defendant after the victim's death. He also assisted in the defendant's arrest. He stated that the officers determined that the defendant was using a telephone belonging to Ms. Evans, and he used "emergency pinging" of that telephone to locate the defendant. He stated that the cellular telephone appeared to have been off until 2:10 a.m. at which time he "started getting pings." Officers located the defendant at the Pilot station "real close to 3:00 a.m."

Prior to locating the defendant, Investigator Washam responded to the scene at the victim's house, where he "observed the scene, did a neighborhood canvas and . . . helped with the other aspects of the case." He stated that "[i]t was very clear" from the disarray of the living room that "there was some type of a confrontation." The medical examiner discovered defensive wounds on the victim's hands, which indicated that the victim had tried to "grab the knife or just deflect . . . the injury."

Investigator Washam stated that, after the defendant was given formal *Miranda* warnings, the defendant provided a voluntary statement. Investigator Washam said that, during the interview, the defendant gave a story that "kept getting more elaborate," and, when they "pressured him for details," the defendant became "a little freaked out" and started "breathing heavy." Investigator Washam took this to indicate that the defendant was "being very deceptive when he needed to be." He said that the defendant had a head injury that "looked quite a bit like an abrasion" and looked like "a different type of wound altogether" than the victim's head injury. Investigator Washam stated that the defendant's head injury and a scratch above his eye did not comport with the defendant's story of the victim's hitting him with the metal pipe.

During cross-examination, Investigator Washam testified that the injury on the defendant's head was near his hairline and appeared to be "more from a scrape." He acknowledged that, after the interview, the officers arranged for the defendant to be taken to the hospital, explaining that "we were really just covering ourselves getting him to medical attention to make sure he was okay."

KPD Officer Todd McFawn testified that he assisted in locating and arresting the defendant. He and his partner drove an unmarked car around the area of West Knoxville where Ms. Evans' cellular telephone was pinging and spotted the defendant's "red Ford Focus in the parking lot of a Pilot" station off of Walker Springs Road. After confirming that the license plate of the vehicle was that of the defendant, Officer McFawn apprehended Mr. Miller as Mr. Miller was walking toward the store, and his partner apprehended the defendant from the vehicle. Officer McFawn stated that other officers arrived and arrested Ms. Evans.

TBI Special Agent Marla Newport testified as an expert in forensic biology. She stated that the jeans recovered from the dumpster were "saturated from head to toe" with the victim's blood. Her testing of the shirt recovered from the dumpster revealed the presence of the victim's blood and the blood of another male, which "profile was inconclusive." The blood samples taken from the knife revealed a "DNA profile . . . consistent with a mixture of three individuals, including at least one male, but due to the complexity of the mixture and the unknown number of contributors to the profile, interpretation was inconclusive." Agent Newport stated that she found the victim's blood on the sheath of the knife, a pair of underwear, and on a pair of socks. Also on the socks, she found minor DNA contributors, but the results were inconclusive. She found the defendant's skin cell DNA on the "inside crotch area of the boxer shorts," indicating that the defendant had worn them.

During cross-examination, Agent Newport acknowledged that she did not test the towels found in the dumpster for the presence of DNA, explaining that the towels had been "used to clean up the crime scene" and because she "already had the victim's blood on other articles of clothing, I didn't examine those." She stated that the form from the KPD indicating the items submitted for testing included a "black metal bar" but that she did not receive the metal bar, and consequently, did not test it. She explained that she did not contact Investigator Madison to check about the absence of the metal bar because "[i]t was my understanding that the victim was stabbed . . . . I was mainly interested in the knife and not a pipe."

Doctor William Oliver, an assistant medical examiner for Knox County, testified as an expert in forensic pathology. He conducted the victim's autopsy in this case. Doctor Oliver found the victim to have suffered 21 sharp force injuries and "two significant blunt force injuries to the head as well as a large number of more trivial blunt force injuries." He stated that "seven-ish penetrating injuries . . . made it into the chest cavity or the abdomen," including two that "penetrated into the lungs" and one that "penetrated into the liver." Several of the wounds were "superficial in size . . . either very shallow stab wounds or slicing wounds." Doctor Oliver explained that the two blunt force injuries to the victim's head "caused lacerations," which he described as "a blow where you hit the

-11-

skin hard enough that the skin will split apart." He said that the "superficial incised wounds" on the victim's hands could have been defensive wounds. He noted that "the injuries [we]re characteristic of a knife that is a single-bladed knife." Doctor Oliver identified the victim's cause of death as "[m]ultiple stab wounds" and the manner of death as homicide.

During cross-examination, Doctor Oliver testified that most of the knife wounds were on the victim's left flank or left back. He stated that he could not determine the size of the knife based on the victim's wounds. The victim had one blunt force injury to the front of his head and one to the back of his head.

On redirect examination, Doctor Oliver clarified that nine of the stab wounds penetrated the victim's chest wall.

The State rested, and, after a full *Momon* colloquy, the defendant elected to testify.

The defendant testified that in early 2018, he worked in the engineering department of the Crowne Plaza Hotel. He was licensed in heating and air conditioning maintenance, and at the hotel, he worked on "anything dealing with heating and air conditioning, electrical, plumbing, carpet, walls, floors, ceilings, anything." In mid-February, he moved in with the victim, where he slept on the living room couch. He kept most of his belongings "in the kitchen in some totes and bags and stuff" and stored his tools in "a walk-in closet-type of room at the front of the house." His arrangement with the victim was to assist in paying for utilities. He stated that, because he was the only one of the roommates with a vehicle, he drove Mr. Williams to and from work. He also drove the victim to work when the victim worked second and third shifts.

The defendant stated that on the morning of April 13, 2018, he drove Mr. Williams to work on Strawberry Plains Pike and gave Mr. Williams a telephone number to text when he was ready for the defendant to pick him up. The defendant explained that he did not have a telephone at that time. The defendant said that, after driving Mr. Williams to work, he "picked up Mr. Miller" and they returned to the defendant's house "and sat there and drank beer together" while they waited for the bank to open, at which time, the defendant drove the victim to the bank to cash his paycheck. On the way home, they "stopped by Al's Market" so that the victim could purchase more beer, and the defendant dropped the victim off at the house and drove Mr. Miller to Mr. Miller's brother's house at approximately 10:00 a.m.

The defendant testified that he then drove to his brother's house in South Knoxville to pick up supplies and a pressure washer for a job the defendant had to do that

afternoon, explaining that he regularly took side jobs in addition to his job at the hotel. The defendant stated that he returned home, unlocked the front door, and walked through the living room toward the kitchen when he "heard something behind me." He said that, as he "turn[ed] to my left," he was "hit with something in the head" and that "it knocks my glasses off, and . . . it kind of makes me hunch over a little bit because of the force of the hit, and as I'm trying to stand back up straight, I get hit again" in the back of his head. The defendant said that he began "to freak out a bit" and, when he raised his hands in a defensive motion, a metal rod "landed in my hand." "I grabbed it with my hands and I swung back trying to hit whoever it was that just hit me." He stated that, as he tried to swing the rod again, the other person took back the metal rod, and the defendant became "really scared," explaining that he could not see who was attacking him because his glasses had fallen off. The defendant said that he rushed at the man, whom the defendant believed to be a burglar, and they "kind of got tangled up" and knocked the furniture around.

The defendant stated that, during the fight, the man again hit him in the head with the metal rod, striking him "at least one more [time] in my hairline" and "right behind the backside of my ear." The defendant said that he suffered "a concussion and a busted eardrum." He said that the man had him pinned to the floor and was straddling the defendant, who was lying on his back. The defendant "had a knife clipped in my belt . . . . And I started stabbing him, trying to stab him to get him off of me." While the defendant stabbed the man, the man continued striking the defendant with the metal rod. During the struggle, the defendant pulled the man toward him and saw that the man was the victim. The defendant said that he felt the victim "kind of loosen up" and heard the metal rod hit the floor." The defendant "just held him there until he quit moving."

The defendant stated that he "was really upset" when he realized the man was the victim because "I've known him for several years and considered him my good friend and didn't understand what was happening and why it was happening." The defendant said that he began to cry and vomit. The defendant retrieved his glasses from the kitchen area and, realizing "how bloody I was all over and everything," he showered and changed clothes. The defendant said that he put down towels from "the bathroom into the living room floor so I wasn't walking through the blood that was on the floor." After showering, the defendant returned to where the victim lay in the living room and, not wanting the victim's attacking him "to be the last picture in my mind" of his friend, he removed the victim's wallet from his back pocket and looked at the victim's driver's license photo in which the victim wore his usual clothing and had "his hair combed and . . . was smiling. And that's the way that I wanted to remember him."

The defendant stated that "at some point . . . I decided that I want to leave and I want to go get high." He put the bloody towels, his clothing, the metal rod, the knife, and the victim's wallet in a trash bag "and put it in the trunk of my car and left." He picked

-13-

up Mr. Miller from Mr. Miller's brother's house and explained to Mr. Miller that his head was bleeding because he "'got hit with a two-by-four.'" The defendant stated that he did not want Mr. Miller to "know[] what had happened" and "didn't want to involve him in any kind of way." The defendant drove to Ms. Newcomb's house in order to make a telephone call to acquire drugs. The defendant asked Mr. Miller to drive to go pick up the drugs because the defendant's "head was hurting that bad." The defendant said that Mr. Miller "knew something was wrong but he wasn't pressing real hard on me telling him what it was." Back at Ms. Newcomb's house, they "smoked some crack cocaine" and later went to pick up Ms. Evans on Middlebrook Pike.

On the way, they stopped to purchase "more drugs so we all could get high." The defendant said that he was the primary person purchasing drugs because he had the most money on him, which money came, at least in part, from his paycheck. After picking up Ms. Evans, the group went to Jim Bob's house where, the defendant acknowledged, they used a lot of drugs; the defendant said that he injected methamphetamine. The defendant said that, at some point, "someone comes into the house and they're talking about all the commotion with the police" at the victim's house, which was "less than a half mile" away from Jim Bob's. He stated that "as the conversation went on, somehow or another," the people at Jim Bob's "put two and two together with my dried blood and stuff I had on my head and the way that I was acting." He explained, "I wasn't acting like a normal person hanging out and getting high. I was very bothered by what happened. So they got kind of defensive and wanted us to leave."

According to the defendant, he, Mr. Miller, and Ms. Evans left in the defendant's vehicle with Mr. Miller driving. The defendant said that he "had a full-sized Chevy 2500 cargo van" parked at a friend's house and that the trio "ended up there and sat there for a little while," but the friend was not home. While there, an officer called Ms. Evans' telephone and asked to speak with the defendant. The defendant said, "I barely remember talking to him at this point because I'm -- I'm wasted. . . . I'm high as I can be." The defendant recalled that the officer asked him, "'Is it easier for you to go to Sevier County police or Knox County police?'" and that he responded that it would be easier for him to go to Knoxville. After that conversation, Mr. Miller drove them back to Knoxville. The defendant said that he "was in the passenger's seat and kept passing out" and did not remember telling Ms. Evans to turn off her telephone. "The next thing I remember after that, we were at some gas station somewhere, and I don't even know where that was." The defendant paid for gas and used the restroom, and they continued on their way. The defendant recalled "turning over to my side and buckling myself in. And then the next thing I remember after that is when the officers are at the car, opening the door, telling me to get out and that I'm under arrest."

The defendant stated that when he was at the police station, he "[v]aguely"

-14-

understood what was going on, "but I had a pretty good idea." He said that he "tried to answer all the questions that they asked me to the best of my knowledge the way I remembered things that happened." After his interview at the police station, he was transported to the hospital to have his head injuries examined.

During cross-examination, the defendant said that when his glasses fell off his face, "they were slightly cracked in the frame." The defendant maintained that he had been struck in the head approximately five times and said that the photograph taken of him the day of his arrest showed "at least two marks."

The defendant stated that he picked up Mr. Miller at Al's Market the morning of April 13, when driving the victim to the bank. The defendant said that he drove Mr. Miller to Mr. Miller's brother's house and asked Mr. Miller "to get money from his brother for him so that I would not be buying all the drugs." The defendant returned home at approximately 1:00 p.m. The defendant acknowledged that he had used crack cocaine earlier that day and that the drug was still in his system at the time he returned home. He denied that he was out of money at that time. The defendant explained that he was very near sighted and could not see well without his glasses. He reiterated that when he was hit in the head, his glasses fell off, and he could not see the person who was attacking him. He could not see his attacker until the men were fighting on the floor and the defendant pulled the man up to his face; at that point, he realized that it was the victim. The defendant explained that he began stabbing the victim before he saw who it was. The defendant stated that the victim did not speak during the fight except for some screaming noises, "like, 'ahhhh.'"

The defendant acknowledged that he did not call the police or an ambulance but, instead, decided to take a shower. He denied that he used bleach to clean up the scene, noting that the bleach stains on the towels were preexisting. He acknowledged that he placed all of his clothing, the bloody towels, and the jack handle in a garbage bag, placed it in the trunk of his car, and later disposed of it. The defendant stated that the metal jack handle belonged to him. He acknowledged that he smoked methamphetamine after killing the victim and drove to pick up Mr. Miller. He also acknowledged that he and Mr. Miller purchased and used more drugs throughout the day and that he did not call law enforcement at any point. The defendant said that he told Mr. Miller that he had been hit in the head with a two-by-four at a job site. He said that he remembered talking to "someone" on Ms. Evans' telephone but that he could not specifically recall with whom he spoke or what he said, noting that he was "already passed out at some point." The defendant denied that he had spent all of his last paycheck on drugs and said that he "had it put up somewhere."

Based upon this evidence, the jury found the defendant guilty as charged. The trial court merged the first degree felony murder convictions and imposed an effective

life sentence.

In this timely appeal, the defendant challenges only the sufficiency of the evidence for his convictions of first degree felony murder.

*Sufficiency of the Evidence*

The defendant contends that the State failed to present sufficient evidence to support his first degree felony murder convictions, alleging that the trial court erred by denying his motion for judgment of acquittal and by denying his motion for new trial, arguing that the theft or robbery of the victim "was a separate, distinct, and independent event," and that "the weight of the evidence was that [the defendant] did not rob or take by theft the wallet of [the victim]." The defendant also argues that the State presented "no proof that [the defendant] was the aggressor, or that [the defendant] acted other than in self-defense." The State argues that the trial court did not err.

Sufficient evidence exists to support a conviction if, after considering the evidence—both direct and circumstantial—in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011). This court will neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Dorantes*, 331 S.W.3d at 379. The verdict of the jury resolves any questions concerning the credibility of the witnesses, the weight and value of the evidence, and the factual issues raised by the evidence. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

As charged in this case, "[f]irst degree murder is . . . [a] killing of another committed in the perpetration of or attempt to perpetrate any . . . robbery . . . [or] theft." T.C.A. § 39-13-202(a)(2). Robbery is "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." *Id.* § 39-13-401(a). "A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." *Id.* § 39-14-103.

It is well established that before a killing will "fall within the definition of felony murder, [it] must have been 'done in pursuance of the unlawful act, and not collateral to it.'" *State v. Banks*, 271 S.W.3d 90, 140 (Tenn. 2008) (citing *State v. Rice*, 184 S.W.3d 646, 663 (Tenn. 2006) (quoting *Farmer v. State*, 296 S.W.2d 879, 883

-16-

(1956))). "In other words, 'The killing must have had an intimate relation and close connection with the felony . . . , and not be separate, distinct, and independent from it [.]'" *Farmer*, 296 S.W.2d at 883 (quoting Wharton on Homicide, § 126 (3rd ed.)); *see also, e.g.*, *Banks*, 271 S.W.3d at 140; *State v. Thacker*, 164 S.W.3d 208, 223 (Tenn. 2005). To satisfy the requirement of "an intimate relation and close connection," "the killing 'may precede, coincide with, or follow the felony and still be considered as occurring 'in the perpetration of' the felony offense, so long as there is a connection in time, place, and continuity of action.'" *Thacker*, 164 S.W.3d at 223 (quoting *State v. Buggs*, 995 S.W.2d 102, 106 (Tenn. 1999)). Moreover, "there should be a causal connection between the killing and the felony." *Buggs*, 995 S.W.3d at 106 (citing *Farmer*, 296 S.W.2d at 884; *State v. Severs*, 759 S.W.2d 935, 938 (Tenn. Crim. App. 1988)). Requiring a causal connection between the homicide and the underlying felony promotes the deterrent effect of the rule by precluding a first degree murder conviction for "killings which are collateral to and separate from the underlying felony." *State v. Pierce*, 23 S.W.3d 289, 296 (Tenn. 2000). "Moreover, requiring a close nexus between the [underlying felony] and the killing is particularly appropriate given that the felony murder rule is 'a legal fiction in which the intent and the malice to commit the underlying felony is "transferred" to elevate an unintentional killing to first-degree murder.'" *Id.* (quoting *Buggs*, 995 S.W.2d at 107).

A killing will be considered to have been committed "in the perpetration of" the underlying felony "where the homicide is so closely connected with the underlying felony as to be within the res gestae thereof, or where the homicide is so linked to the felony as to form one continuous transaction." *Buggs*, 995 S.W.3d at 106 (citing 40 Am. Jur. 2d Homicide § 67 (1999)). "The res gestae embraces not only the actual facts of the transaction and the circumstances surrounding it, but also the matters immediately antecedent to the transaction and having a direct causal connection with it, as well as acts immediately following it and so closely connected as to form in reality a part of the occurrence." *State v. Patrick Wingate*, No. M1999-00624-CCA-R3-CD, slip op. at 9 (Tenn. Crim. App., Nashville, May 25, 2000) (citing *Payne v. State*, 406 P.2d 922, 925 (Nev. 1965)).

The evidence adduced at trial, considered in the light most favorable to the State, established that the defendant drove the victim to cash a check on the morning of April 13, 2018. The defendant smoked crack cocaine that morning and drove Mr. Miller to Mr. Miller's brother's house hoping that Mr. Miller would obtain money for more drugs. The defendant returned to the house he shared with the victim and, by his own admission, hit the victim with a metal jack handle, stabbed him multiple times, and took the victim's wallet from his pocket. Then, instead of calling for emergency assistance for himself or the victim, the defendant showered, placed his bloody clothes, towels, the metal jack handle, the knife, and the victim's wallet in a garbage bag. He left the victim lying in a pool of his own blood, and picked up Mr. Miller to continue a day of drug use.

-17-

The defendant lied to Mr. Miller about the injuries to his head and, under the pretense of cleaning out his car, asked Mr. Miller to dispose of the garbage bag containing the evidence from the crime scene. The defendant spent the better part of the day doing crack cocaine and methamphetamine, purchasing additional drugs multiple times. When the defendant became concerned that he was suspected in the victim's death, he drove to a location near Seymour, where he smoked more crack cocaine. During a telephone call with a law enforcement officer, the defendant lied about his whereabouts during the day and the color of vehicle he was in. He also instructed Ms. Evans to turn off and remove the battery from her cellular telephone.

From these facts, a rational trier of fact could have found beyond a reasonable doubt that the defendant killed the victim in order to steal the victim's wallet. The defendant took the victim's wallet immediately after the victim was incapacitated from the attack and at no point sought medical attention for the victim. Although the defendant testified that he struck and stabbed the victim out of self-defense and took the victim's wallet in order to view the victim's driver's license photograph to restore fond memories, the jury rejected that argument, as was their prerogative.

Accordingly, the judgment of the trial court is affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE